# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 12, 2016 Session

### JASON RICHARD MADDEN v. JILL CARA MADDEN

**Appeal from the Chancery Court for Williamson County**
**No. 41096      Michael W. Binkley, Judge**

_____

### No. M2015-01301-COA-R3-CV – Filed July 28, 2016

_____

In this divorce action, Father appeals the trial court's classification of the marital residence as an asset and the division of the marital estate. He also challenges the designation of Mother as the primary residential parent and the residential schedule. For her issue, Mother contends she should be granted exclusive authority to make all major decisions regarding the child due to the parents' inability to agree upon such matters. We affirm the trial court's classification and division of the marital estate. We also affirm the designation of Mother as the primary residential parent and the parenting plan with one exception. The parenting plan directs major decisions concerning the child be made jointly by Mother and Father. Because the evidence preponderates in favor of the finding that the parents are unable to agree upon matters concerning the child's education and non-emergency healthcare, we remand with instructions to modify the parenting plan by awarding Mother sole decision-making authority regarding such matters. *See* Tenn. Code Ann. § 36-6-407(b) ("The court *shall* order sole decision-making to one (1) parent when . . . [b]oth parents are opposed to mutual decision making;").

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD H. DINKINS and ARNOLD B. GOLDIN, JJ., joined.

Charles G. Blackard and Adrian H. Altshuler, Franklin, Tennessee, for the appellant, Jason Richard Madden.

Deana C. Hood, Franklin, Tennessee, for the appellee, Jill Cara Madden.

### OPINION

Jason Richard Madden ("Father") and Jill Cara Madden ("Mother") married on April 23, 2006, and they have one minor child from the marriage, a daughter born in

December of 2007. The parties separated in May 2012, and on June 20, 2012, Father filed a complaint for divorce citing the grounds of irreconcilable differences. Mother filed an answer admitting to irreconcilable differences and asserted the statutory defense of justifiable cause, *see* Tenn. Code Ann. § 36-4-120, and requested that the parties be declared divorced pursuant to Tenn. Code Ann. § 36-4-129.

The case was tried on September 4 and 5, 2014. The testimony presented during the two-day trial primarily focused on establishing a permanent parenting plan and the classification and division of the marital estate, specifically the marital residence. Mother and Father sought to be named primary residential parent of their child. Mother proposed a parenting plan that granted her 240 days and Father 125 days of parenting time. Father proposed a parenting plan that granted him 285 days and Mother 80 days.

Mother testified that she should be the primary residential parent because she has been the child's primary caregiver since her birth. Mother testified that she cared for all of the child's basic needs including bathing and feeding, and that she scheduled the child's medical appointments and play dates with other children. Father agreed that Mother had been the child's primary caregiver during the marriage; however, Father testified that he should be the primary residential parent because Mother made "totally unfounded" accusations that Father sexually molested the child. Mother insisted that her accusations of abuse were made in good faith and testified at length as to incidents that occurred during the parties' marriage that gave her concerns that Father was sexually abusing the child.[1] She testified that she reported the abuse after the child made statements that Father had touched her. Mother's report was investigated by the Department of Children's Services, which determined the allegations to be unfounded.

As to the marital estate, the parties reached an agreement prior to trial as to the division of the marital property with the exception of the marital residence, Father's pension, and the expenses of expert psychologist James Walker, PhD.[2] The testimony at trial, however, principally focused on whether the marital residence was unencumbered.

Mother and Father purchased the marital residence in 2009, paying cash for the full purchase price of $290,000. It is undisputed that $240,000 of the cash payment was transferred to Mother and Father from Richard Madden ("Rick Madden"), the father of Father, to assist them in their purchase of the marital home. However, Mother and Father dispute whether the $240,000 was a mortgage, loan, or gift.

---

[1] Having reviewed the record, including the trial court's findings as to this issue which we address later, we do not believe it necessary to repeat the details of the alleged abuse in this opinion.

[2] Following the initiation of the divorce action, Dr. James Walker was appointed for the purpose of evaluating the parties psychologically. The issue of delegation of payment for fees and expenses of Dr. Walker was reserved for the divorce hearing.

Mother consistently testified that she did not consider the $240,000 a loan to be repaid. She testified that she did not execute any written agreement stating that she must repay the $240,000 and that Rick Madden never told her that he expected her to repay the money. According to Mother, the $240,000 was a gift to the parties from Rick Madden to assist them in their purchase of the marital residence. Mother also testified that Father explained to her that the money was an "early inheritance" from his father but that he wanted to make monthly interest payments to his father to help Mother and Father appreciate the value of the money they were given.[3] She further testified that it was her understanding that the parties were to make the monthly interest payments until Father's parents passed away, after which there would be no need to continue paying. In support of her position that the marital residence was unencumbered marital property, Mother offered the Warranty Deed to the property evidencing title in the names of Father and Mother and testified that there was no deed of trust or encumbrance on the property.

Father sought to have the intra-family transaction classified as an enforceable mortgage and asserted that it should be repaid from the proceeds from the sale of the marital residence. In support of this position, Father testified that the parties made monthly interest payments to his father. He also presented the parties' joint tax returns wherein Mother and Father took a mortgage interest deduction and the corresponding joint tax returns of Rick Madden and his wife wherein they reported mortgage interest payments.

Rick Madden, who is a certified public accountant and has an extensive work history in the banking industry, testified that the transaction was a loan. He testified that he was able to loan Mother and Father the money by taking out a $240,000 advance on his home equity loan and that he holds a "private mortgage" on the marital residence.[4] He stated that he spoke with his son regarding the terms of the loan; however, Rick Madden did not recall a conversation with Mother regarding whether the money was a loan and whether or not he expected repayment. Rick Madden further testified that he did not require the parties to sign a promissory note or execute a deed of trust and that there is no amortization schedule.

The parties stipulated to the grounds for divorce and in its Final Decree of Divorce entered on November 21, 2014, the trial court declared the parties divorced pursuant to

---

[3] The parties' practice of paying monthly interest payments to Rick Madden was not uncommon. Prior to purchasing the marital residence, the parties lived in a townhome owed by Rick Madden. Mother testified that Rick Madden was aware that the parties wanted to purchase a home in the future and wanted to help prepare them for the costs incurred from owning a home. As a result, Father and Mother paid the real estate taxes and mortgage interest on that property.

[4] Immediately following Rick Madden's testimony, the trial court said to him, "So this is a private mortgage essentially," to which he responded affirmatively.

Tenn. Code Ann. § 36-4-129. Concerning the issue of whether Father sexually abused the child and whether Mother made false accusations, the court concluded:

> I don't know what happened. But the proof appears to me by a preponderance of the evidence that there was no child sexual abuse. I just can't say – be comfortable saying there was. One the other hand to reiterate, I understand how [Mother] feels. I understand her subjective thoughts about what she believes happened and I respect that.

With regard to the parenting plan, the court found that, although the majority of the factors under Tenn. Code Ann. § 36-6-106 favored both parties equally, an equal division of parenting time was not in the child's best interest. The trial court found that the child needed stability and continuity and, because Mother had been the primary caretaker, this factor weighed in favor of Mother. The trial court designated Mother primary residential parent and awarded her 232 days and Father 133 days of parenting time. With respect to major decisions concerning the child, the trial court ordered the parents to make such decisions jointly, stating: "I think both parents should be involved in discussing with each other educational decisions, non-emergency health care, religious upbringing and extracurricular activities. I have faith in both of you that you can do that from this point forward. Bottom line is you will have to or some other judge will arrange this if you can't do it yourselves."

Turning to the division of the marital estate, the trial court assessed the expenses of psychologist Dr. Walker equally to the parties and awarded Father his accumulated pension as his sole and separate property. The court found the marital residence to be unencumbered marital property and ordered the sale of the residence with the proceeds to be divided equally between the parties. In reaching its decision, the trial court made thorough findings of fact and conclusions of law and provided alternative rulings. The order reads in pertinent part:

> [With] regard to the mortgage issue . . . [Father] is not the person to assert his parents' (specifically Mr. Rick Madden) interest in the parties' marital residence. The Court specifically finds that [it] does not have jurisdiction to adjudicate Mr. Rick Madden's interests and rights (i.e. financial interest in the parties' marital residence) as Mr. Rick Madden is not a party to these proceedings.
>
> Secondly, the Court finds that the interest in the marital residence is a pure legal issue; and incident thereto is the fact that the marital residence is marital property to be equitably divided and ownership thereof is evidenced by a Warranty Deed. The Warranty Deed is clearly titled exclusively in the names of Jason Madden ["Husband"] and Jill Madden ["Wife"], the parties. It is the Wife's contention that the $240,000.00 to acquire the marital

residence was a gift (also referred to as an early inheritance) from Husband's parents (specifically Rick Madden). It is Husband's position that the funds received [from] Rick Madden to acquire/purchase the marital residence were a loan; and such is evidenced by the interest payments from the parties to Husband's parent (i.e. Rick Madden). These interest payments are only memorialized by entries upon the parties' joint tax returns and the joint tax return of Rick Madden with his wife. . . . [T]he Court finds interesting that no actual mortgage and/or loan was placed and/or recorded against the marital residence. The Court acknowledges that the parties filed taxes claiming a mortgage interest deduction and Husband's parents filed tax returns claiming mortgage interest income. Also, particularly noted by the Court is that Mr. Rick Madden was particularly financially sophisticated (i.e. achieving the status as a [CPA] and having worked in the banking industry). What troubles the Court is that there is no specific requirement to repay principal, no promissory note, no requirement to execute a Deed of Trust, and no fixed time to pay as the parties were to apparently pay in perpetuity.

Thirdly, given all these factors, the Court then looked to the application of the Statute of Frauds pursuant to [Tenn. Code Ann. §] 29-2-101 and thusly, finds the Statute of Frauds to be applicable to this transaction. The Court references the case of *Mifsud vs. Dominion Bank* [*of Middle Tn.*, No. 01A01-9305-CH-00233, 1993 WL 477012 (Tenn. Ct. App. Nov. 17, 1993)]; as much as that case can be applied, and the Court certainly does not find that case directly on point but helpful. The Court of Appeals interprets case law to support a premise that related documents to a sale of real estate fall under the Statute of Frauds and must be in writing. Following the logic in *Mifsud*, Husband's promise to repay his parents is a promise to make another-that is his mother or father, the owner of a lien or charge upon the land, i.e. a mortgage that was not filed. Thusly, as the result of actions of the parties and Mr. Rick Madden, it is the finding of the Court that if such actions were intended to create a mortgage, then the transaction would squarely fall subject within the Statute of Frauds, and even though there may be evidence of interest payments as recorded upon individual tax returns, such does not suffice to establish a written instrument constituting a mortgage or loan and fails to be enforceable by this Court.

[A]s an alternative finding, the Court considered whether the application of contract law and substantial performance supports Husband's position of establishing a loan. The Court looks to the applicability of *Farley v. Ellis*, [No. W2000-00354-COA-R3-CV, 2000 WL 1876431 (Tenn. Ct. App. Dec. 27, 2000)] . . . wherein the Courts have continuously denied enforcement of

oral contracts of the sale of land wherein part performance of an oral contract for sale of land will not take the agreement out of the Statute of Frauds. Further, Tennessee courts have held that partial performance is applicable only in cases of personality, not realty. The facts of this case do not take the agreement out of the Statute of Frauds, despite evidence of tax returns.

Fourthly, as an alternative finding is the applicability of equitable estoppel whether such was asserted or not, the Court finds that Husband clearly fails to meet his burden of proof by clear and convincing evidence, and therefore, the application of equitable estoppel is precluded.

Fifthly, as an alternative finding, the Court considers application of an implied contract to establish the mortgage transaction. The Court finds the facts do not support a consumer loan and as such a mortgage is not to be implied in fact nor implied in law.

Sixthly, the Court considered whether the mortgage transaction could be established by unjust enrichment, quasi contract, and/or quantum meruit. The facts of this case do not support such a remedy, and further, because proof to establish such must be clear and convincing which this Court finds to be absent; such application cannot be made.

This appeal followed. Although stated differently, Father contends the trial court erred by designating Mother as the primary residential parent. Specifically, he asserts that the record "clearly shows Mother made false allegations of sexual abuse," and "otherwise, the parties were both equally capable of parenting the parties' minor child . . . ." As to the intra-family transaction, Father contends that the evidence supports a finding that this transaction was a loan and therefore the marital residence should be classified as a martial debt rather than an asset. Alternatively, he argues that if the $240,000 is determined to be a gift, then the gift should be classified as his separate property because it was a gift to him from Rick Madden, and not a gift to Mother. Father also challenges the trial court's division of the marital estate.

For her part, Mother contends the trial court erred by ordering the parties to make all major decisions regarding the child jointly. Mother asserts that she should be the sole decision maker regarding all major issues pursuant to Tenn. Code Ann. § 36-6-407(b), which provides that the court "*shall* order sole decision-making" to one parent when "[b]oth parents are opposed to mutual decision making" or when one parent is "opposed to mutual decision making, and such opposition is reasonable in light of the parties' inability to satisfy the criteria for mutual decision-making authority." Mother also seeks to recover her attorney's fees on appeal.

## ANALYSIS

## I. PARENTING PLAN

Father contends the trial court erred by designating Mother as the primary residential parent. He also contends the trial court erred by failing to award equal parenting time to each parent. For her part, Mother contends the trial court erred by not granting her exclusive authority to make all major decisions regarding the child.

This court reviews decisions in divorce cases de novo with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990). Moreover, appellate courts are reluctant to second-guess a trial court's determination regarding parenting schedules. *See Adelsperger v. Adelsperger*, 970 S .W.2d 482, 485 (Tenn. Ct. App. 1997). "Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent. In reaching such decisions the courts should consider the unique circumstances of each case." *Burton v. Burton*, No. E2007-02904-COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009) (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999); *see also Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001).

Trial courts have broad discretion to fashion parenting plans that best suit the unique circumstances of each case. *See Parker*, 986 S.W.2d at 563. Furthermore, it is not the role of the appellate courts to "tweak [parenting plans] ... in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). Decisions regarding parenting schedules often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Adelsperger*, 970 S.W.2d at 485. Thus, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

## A. Primary Residential Parent

Before addressing the substance of Father's argument, we must address his failure to comply with the rules governing appeals to this court.

Tennessee Rule of Appellate Procedure 27(a)(7) states that the brief of the appellant shall contain an argument setting forth "the contentions of the appellant with respect to the issues presented . . . including the reasons why the contentions require appellate relief, *with citations to the authorities and appropriate references to the record* (which may be quoted verbatim) relied on . . . ." (Emphasis added). The Rules of the

Court of Appeals set forth the format and content of the written argument in regard to each issue on appeal. Rule 6(a) states that the argument for each issue shall contain:

> 1. A statement by the appellant of the alleged erroneous action of the trial court which raises the issue . . . with citation to the record where the erroneous or corrective action is recorded.
> 2. A statement showing how such alleged error was reasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.
> 3. A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.
> 4. A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

Tenn. Ct. App. R. 6(a). Rule 6(b) of the Rules of the Court of Appeals then provides that

> No complaint for reliance upon action by the trial court will be considered on appeal unless the argument thereon contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument upon such assertion contains a reference to the page or pages of the record where evidence of such fact is recorded.

The entirety of Father's argument that the trial court erred in awarding Mother primary residential parent reads as follows:

> [T]he record clearly shows Mother made false allegations of sexual abuse of the parties' minor child by Father; and such should not result in the Trial Court awarding to Mother "Primary Residential Parent", especially when the parties are fully capable of shared/equal custody and parenting time and have proven their respective abilities to do so for an extended 2½ year period of time. Awarding primary custody to Mother is not in the best interest of the parties' minor child given the particular circumstances of this case. The Court should remand to set parenting time to be equal, and consistent with T.C.A. 36-6-106 "allowing maximum time to each party".

As the above clearly reveals, Father failed to cite any authority that supports his argument that the trial court erred in designating Mother as the primary residential parent; thus, he failed to comply with Tenn. R. App. P. 27(a)(7). Further, instead of including facts with citations to the record in support of his position, Father merely offers conclusions such as "the record clearly shows . . ." and "awarding primary custody to Mother is not in the best interests of the parties' minor child given the particular

circumstances of this case." Based on his failure to comply with these rules, Father has waived this issue on appeal.[5] However, even if Father had preserved this issue, we find no merit in the substance of his arguments.

In this case, the trial court first addressed the issue of whether Father sexually abused the child or whether Mother made false allegations. The trial court found that the evidence did not support a finding that Father sexually abused the child. However, the trial court also concluded that Mother's allegations were made in good faith, emphasizing: "On the other hand to reiterate, I understand how the mother feels. I understand her subjective thoughts about what she believes happened and I respect that."

In its detailed analysis, the trial court stated that it arrived at the permanent parenting plan based on an analysis of the relevant statutory factors set forth in Tenn. Code Ann. § 36-6-106, and we are able to correlate the trial court's findings with the associated factors. Although the trial court found that the majority of the factors favored both parties equally, the court found that an equal division of parenting time was not in the child's best interest. In conducting the best interest analysis, the trial court noted that stability and continuity in the child's life was "the most important thing." The evidence in the record preponderates in favor of the trial court's finding that stability and security is paramount to the child's best interest and Mother has offered that stability as the primary care giver, attending to her basic daily needs, healthcare, and education. Moreover, Father did not dispute that Mother was the primary caregiver.

A decision regarding a child's best interest should place the child in an environment that will best serve the child's physical and emotional needs. *Barnes v. Barnes*, No. W2002-00428-COA-R3-CV, 2002 WL 31387268, at *3 (Tenn. Ct. App. Oct. 23, 2002) (citing *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999)). We are specifically instructed not to "tweak" a visitation order in the hope of achieving a more reasonable result than the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). We would be remiss not to state that Father appears well-intentioned and obviously loves the child, but the evidence does not preponderate against the trial court's finding that the factors in Tenn. Code Ann. § 36-6-106 weigh in Mother's favor.

Because the evidence does not preponderate against the trial court's findings, we affirm the designation of Mother as the primary residential parent.

---

[5] "Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000); *see also Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (holding that the failure to cite to any legal authority or to fashion an argument constitutes waiver of an issue); *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003) ("Failure to cite authority for propositions in arguments submitted on appeal constitutes waiver of the issue.").

## B. Joint or Sole Decision-Making

In the permanent parenting plan, the trial court directed Mother and Father to make decisions jointly insofar as they concern the child's education, non-emergency healthcare, religious upbringing, and extracurricular activities. Specifically, the trial court stated: "[B]oth parents should be involved . . . . I have faith in both of you that you can do that from this point forward. Bottom line is you will have to or some other judge will arrange this if you can't do it yourselves." Undoubtedly, the child's best interests will be served if the parents can harmoniously make joint decisions regarding their child. In this case, however, Mother and Father mutually opposed joint decision making regarding the child's education and non-emergency healthcare and there is ample evidence of the parties' difficulty communicating and reaching a consensus with regard to these decisions.[6]

Mother testified that Father frequently did not send the child to preschool and that he did not review the child's school documents. She further testified that they have a history of controversy and argument over the child's medical history, diagnosis, and prognosis. She stated that Father refuses to acknowledge that the child has asthma and a food allergy to cashews even though the child had been diagnosed with both.[7] Mother also testified as to an occasion when Father took the child to a walk-in clinic, without informing Mother of the visit or that the child was prescribed medication.

For his part, Father testified that the parties have had "a ton of parental issues" since Mother made allegations that Father sexually abused the child. He further testified that Mother does not provide him with information regarding the child including medical and school records. Father acknowledged the child's asthma diagnosis but testified that

---

[6] Mother proposed joint decision making regarding the child's religious upbringing and extracurricular activities. Although Father opposed joint decision making as to these issues, Father did not appeal the trial court's allocation of decision-making authority.

[7] Mother presented the child's medical record dated July 19, 2011, showing a positive result for a food allergy to cashews and a diagnosis of "chronic cough, possible reactive airway component." The medical record further indicated the "Plan" for treatment as follows:

> 1. Strict avoidance of all tree nuts and peanuts given Positive SPT [skin prick test] to cashew. Given negative SPT, may reintroduce watermelon OK to nave peanut butter if desired.
> 2. EpiPen Jr. provided for PRN anaphylaxis use. EpiPen teaching provided.
> 3. Food allergy action plan completed and copy provided to family.
> 4. Rx Albuterol inhaler wits spacer teaching/asthma education for PRN. Discussed that nighttime cough and exercise symptoms may be possible reactive airway disease/asthma, especially given improvement with beta agonist. Will re-assess cough at next visit and consider ICS at that time.
> 5. Follow-up in clinic in 3 months.

he does not believe the child has asthma because he has never witnessed the child with asthma related symptoms.

"[W]here the parents are unable to agree on matters of great importance to the welfare of their minor children, the primary decision-making authority must be placed in one parent or the other." *Webb v. Webb*, No. M2012-02438-COA-R3CV, 2013 WL 6706855, at *2 (Tenn. Ct. App. Dec. 17, 2013) (quoting *Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *7 (Tenn. Ct. App. Dec. 12, 2008)). Further, Tennessee Code Annotated § 36-6-407(b) states that the "court *shall order sole decision-making to one* (1) parent when it finds that: . . . Both parents are opposed to mutual decision making; or . . . One (1) parent is opposed to mutual decision making, and such opposition is reasonable in light of the parties' inability to satisfy the criteria for mutual decision-making authority."

In consideration of the entire record in this case, we conclude that joint decision-making on matters involving the child's non-emergency healthcare and education is not in the child's best interest. Further, Mother is the most suitable person to exercise this important function. Although Mother argues on appeal that she should also be awarded sole-decision making authority for the child's religious upbringing and extracurricular activities because Father opposed joint-decision making, Mother did not make this argument in the trial court. To the contrary, Mother testified that it was in the child's best interest that these decisions be made jointly.

For the foregoing reasons, we remand with instructions for the trial court to modify the permanent parenting plan to change the decision making authority from "joint" to "Mother" for the decisions pertaining to the child's education and non-emergency healthcare.

## II. THE $240,000 QUESTION

Father contends that the trial court erred by finding the $240,000 intra-family transaction to be unenforceable as a mortgage or loan and, thus, a gift. Although stated differently, he insists that the evidence supports a finding that the transaction was a loan and, as such, the martial residence should be classified as a marital debt.

"The determination of whether an intra-family transaction is a loan or a gift is a question of fact." *Hayes v. Hayes*, No. W2010-02015-COA-R3CV, 2012 WL 4936282, at *7 (Tenn. Ct. App. Oct. 18, 2012) (citing *Woods v. Woods*, No. M2002-01736-COA-R3-CV, 2005 WL 1651787, at *7 (Tenn. Ct. App. July 12, 2005)). In concluding that the intra-family transaction was unenforceable as a mortgage or loan, the trial court stated that it considered all information presented including the testimony of witnesses at the trial, and all exhibits including the Warranty Deed, the parties' joint tax returns, and the joint tax returns of Rick Madden and his wife. The trial court also set forth its specific

findings of fact and conclusions of law on this issue. The ones that are relevant to this issue read as follows:

> [Mother] offered the warranty deed and the property clearly is titled in [Father] and [Mother's] name. [Mother] says . . . the $240,000 for the purchase price was given to her and [Father] from [Father's] parents. . . . She also testified that it was explained to her by [Father] that the money was essentially an early inheritance. And in order to have both of them understand and appreciate the value of money, and essentially what they were given, he wanted them to make interest payments back to the parents, wanted them to both make interest payments back to the parents.

> [M]r. Rick Madden did not recall whether he had a conversation with [Mother] about whether the money was a loan and whether or not there was expected repayment of that loan. Mr. Rick Madden, as I understand it from his testimony, spoke with his son regarding the terms of the loan. Mr. Rick Madden claimed that it was a loan, and he holds a mortgage on that property as evidenced by his tax returns where he reported the mortgage interest and [Mother and Father] took a mortgage interest reduction on their tax returns.

> Also, there was testimony from Mr. Rick Madden's other sons that he essentially provided them with the same financial benefit, which is very generous, no doubt about it. In addition to that they also testified about the same arrangement, that there was no actual mortgage placed against the home, but there was a deal where the interest deductions were taken on the individual tax returns just as the parties had done in the present divorce case.

> All parties testified as I recall that it was their understanding they would continue to pay the interest in perpetuity or until the loan was repaid. . . . I asked that question because there was no amortization schedule. There was no Deed of Trust, and there was no lien filed.

> I kept looking for incidences of the oral testimony that this was a mortgage. What are the actual incidences in the law that would support that oral statement that it was a mortgage. I kept asking, where is your amortization schedule? Where is your note? Where is the lien?

> [I]t is interesting that what I got was the tax returns showing interest deduction, that is interesting. That is some evidence that the oral statement that was made that was in controversy had some teeth in it. Some evidence. The thing that I recall too is that Mr. Rick Madden testified regarding his

extensive financial education and his work history in the banking industry. Very impressive. Not only had he been head of a bank and had a CPA degree, he also had extensive knowledge based on his past as he testified to not only basic finance but also advanced finance, he had a full understanding of it, there is no question about it.

And my question to myself, why in the world, if you intended this to be a mortgage, did you not place a mortgage on the home? Why did you not with your extensive knowledge and understanding, set it up just like any other business arrangement if that is what you meant, with an amortization schedule with the expectation that what you stated was in fact what you meant. Again, evidence, documentary evidence of what you said supporting exactly what you said. That was not done.

And then I had the testimony from [Father], who said, well, yes, we are supposed to pay that back. And [Mother], says no, this was supposed to be a gift. [T]hen Mr. Rick Madden says, you know, I wanted to give that to them because I done that for my sons, but I wanted them to understand financial responsibility, so I wanted them to pay back some of the money. I understand.

[A]ll parties testified there was no requirement for the payment of principal, and there was no time frame by which to make a payment towards the principal, i.e., amortization schedule. Again, Mr. Rick Madden testified regarding his extensive financial education and his work experience. It is undisputed that [Mr.] Rick Madden did not require [Mother] or [Father] to sign a promissory note. There is no evidence of that. It is also undisputed that Mr. Rick Madden did not require [Mother] or [Father] to execute a Deed of Trust. . . . In addition to that, there was no fixed time period at all for the loan to repay, it was just in perpetuity.

In this case, Mother and Father gave differing accounts of whether the transaction was intended to be a loan or a gift, yet the documentary evidence and lack of promissory note fully support Mother's testimony. Moreover, although Father insists that there was sufficient proof before the court to support a finding that the transaction was a loan, Father failed to provide any citations to the record as to where this "proof" exists. In support of his position, Father merely states that the "testimony alone is proof of this fact." He does not dispute the fact that there is no promissory note or deed of trust evidencing the loan. Instead, he insists that the interest payments memorialized by entries on the parties' joint tax returns and the joint tax return of Rick Madden and his wife is "corroborating evidence" to support the conclusion that the transaction was a loan.

Father alternatively contends that "if the transaction [is] a gift, then the gift was made to [Father] only and not to [Mother]," and should be classified as his separate property. This issue is being raised for the first time on appeal. "[I]ssues raised for the first time on appeal are waived." *See Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996). We conclude that Father has waived this issue by failing to properly raise the issue in the trial court.

Because Father has failed to cite to evidence that preponderates against the court's finding that the intra-family transaction is unenforceable as a mortgage or loan and, thus, a gift, we affirm the trial court's determination that the marital residence is unencumbered marital property.

### III. EQUITABLE DIVISION OF MARITAL PROPERTY

Father contends that the trial court erred by awarding Mother half of the interest in the marital home. The entirety of his argument on this issue in his brief reads:

> It would be [Father's] submission that the portion provided by [Mr. Rick Madden] (i.e. $240,000) be awarded to [Father] as being property tendered to [Father] by his father (and/or a debt to his father); and thereafter, any and all proceeds in excess be divided one-half (1/2) to each party. Truly the award of $120,000.00 to Wife would be an unjust "windfall" not worthy of any contemplation of "equitable" division in nature and clearly an abuse of the Court's discretion in its charge of making an "equitable distribution".

This argument fails to satisfy Tennessee Rules of Appellate 27(a)(7) and Tennessee Court of Appeals Rule 6(a). Additionally, Father failed to comply with Rule 7 of the Tennessee Rules of the Appellate Court requiring that in all cases in which a party takes issue with the classification and division of marital property, the party must include in its brief a chart specifying the property values proposed by both parties, the value assigned by the trial court, and the party to whom the trial court awarded the property. Tenn. Ct. App. R. 7.

 "[P]arties cannot expect this court to do its work for them." *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (citing *England v. Burns Stone Company, Inc.*, 874 S.W.2d 32, 35 (Tenn. Ct. App. 1993)). Moreover, "[t]his Court is under no duty to verify unsupported allegations in a party's brief or for that matter consider issues raised but not argued in the brief." *Id.* (citations omitted). Due to the deficiencies in Father's brief on this issue, we find the issue waived.

## IV. ATTORNEY'S FEES ON APPEAL

Mother seeks to recover her attorney's fees and expenses on appeal. Whether to award attorney's fees on appeal is within this court's sole discretion. *Wilson v. Wilson*, No. M2008-02073-COA-R3-CV, 2009 WL 1037943, at *4 (Tenn. Ct. App. April 17, 2009) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). In considering a request for attorney's fees, we examine "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal . . . and any other equitable factor that need be considered." *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003) (citing *Folk v. Folk*, 357 S.W.2d 828, 829 (Tenn. 1962)). After considering these factors, we decline to award Mother her attorney's fees on appeal.

## IN CONCLUSION

The judgment of the trial court is affirmed as modified and this matter is remanded to the trial court for further proceedings consistent with this decision. Costs of appeal are assessed against Jason Richard Madden.

_____
FRANK G. CLEMENT, JR., JUDGE